THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ELZY ALBERT PARKER, Defendant-Appellant.

First District (3rd Division)   No. 61868

Opinion filed July 22, 1976.

James J. Doherty, Public Defender, of Chicago (Matthew Beemsterboer and Marilyn D. Israel, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Larry L. Thompson, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

The defendant, Elzy Parker, and two co-defendants were charged with the murder of Howard Moore and the aggravated battery of Johnny Carter. A severance was granted to the defendant, he was tried by a jury, found guilty and sentenced to concurrent terms of 40 to 100 years and 3 to 10 years in the penitentiary. Parker appeals this conviction, contending that he was not proven guilty beyond a reasonable doubt; that the trial court's and prosecutor's misconduct deprived him of a fair trial; that several reversible errors were committed by the court, and that his sentence was excessive.

Moore's widow, Magdelene, testified that on August 10, 1973, she was living with him and their two children in a first-floor apartment at 4237 North Kenmore, Chicago. Johnny Carter, Mrs. Moore's brother, lived with them. Parker and his two co-defendants, Joe Malveaux and Eddie Mitchell, lived in an apartment on the third floor of the same building.

Mrs. Moore stated that she had known Parker, Malveaux and Mitchell for several months prior to August 10. She refused to described the three men as "friends," although she admitted that she had been up to their apartment on numerous occasions.

At 6 o'clock in the evening of the 10th, Mitchell and Mrs. Moore and her two children went to the beach. They stayed until approximately 9 p.m. Moore and Carter did not go with them because Moore went to a doctor and Carter had gone to work. When the group returned home, Moore was standing in the back yard. Parker and Malveaux came down the back stairs and said that someone had broken into their apartment. Mitchell asked Moore if he knew anything about the burglary and Moore replied that he did not.

Sometime later Mitchell came to the Moore home and invited them upstairs. The entire Moore family followed Mitchell up to his apartment.

Once inside, Mitchell locked the door, bolted it and nailed it shut. He declared that no one was going to leave until his belongings were returned. This was the start of a night-long ordeal for Moore. He was confined to the apartment from about 10 p.m. until 5:15 a.m. when he was rescued by police officers.

Mitchell asked Moore where his property was and Moore replied that he did not know. Moore suggested that Mitchell should ask other people in the building about the missing items and if they would call the police he would let them search his apartment. Parker replied: "We don't need no police, we'll be the police." At this point, Malveaux and Mitchell left the apartment but before they went they instructed Parker, who was seated in a chair with two baseball bats next to him, not to let the Moores leave.

Malveaux and Mitchell returned with the manager of the building, a man by the name of Otto. When Otto denied knowing anything about the missing articles, Parker picked him up and threw him onto a table. After this, he was permitted to return downstairs. Mitchell and Malveaux also left, this time to search the building for the stolen items.

While they were away Parker threatened to kill the Moores and put their bodies in garbage cans. After the men returned Mitchell struck Moore three or four times across the leg with one of the baseball bats. He also threw a large knife towards the door, which was in Mrs. Moore's direction. About midnight, Parker told Mrs. Moore to get her children, who were asleep on the kitchen floor, and go downstairs. As she passed her husband he begged, "Don't leave me."

Mitchell went downstairs with Mrs. Moore. When she unlocked her front door, Johnny Carter, who was sitting on the outside front steps, heard her. He had arrived home from work close to 12:30 p.m., found the Moores' door locked and went outside to wait. Upon seeing Carter, Mitchell told Mrs. Moore not to say anything to him. Malveaux joined them and he invited Carter to a party they were giving in the upstairs apartment. When the men started upstairs, Mitchell warned Mrs. Moore not to leave her home and not to call the police. Mrs. Moore, terrified, did as she was told.

When Carter entered the third-floor apartment he saw blood on Moore's face and shirt, a baseball bat in Parker's hand and another one lying on the floor beside Parker's chair. Malveaux drew a knife and told Carter to sit down and not to move. Mitchell went into a bedroom and came back with a butcher knife.

Malveaux asked Carter where their stolen articles were. Carter said that he knew nothing about them and could not know anything about them because he had been at work. He produced a receipt for his day's pay and showed it to Mitchell. Mitchell stated, "Yes, you've been working."

Parker, however, repeated the questions. When Moore and Carter

protested their innocence, Parker struck them alternately with a bat, swinging at them "the same as he would be swinging at a baseball." During one of the beatings, the bat broke in half but Parker, who was 6'4" tall and weighed 250 pounds, continued to strike Moore, who was 5'10" tall and weighed 136 pounds, with the larger end. Malveaux punched Carter with his one hand while pointing a knife at him with the other. Mitchell, armed with the butcher knife, guarded the front door.

Moore asked them to have his wife call an Eddie Harris to see if he knew where the missing items were. While Mrs. Moore was being summoned, Parker again struck Moore with the bat. When Mrs. Moore came in she saw that her husband and brother were bleeding and that their shirts were covered with blood. She and Mitchell left to call Harris. They went to a building across the street because the Moores had no telephone and the one in the building was out of order. They were unable to reach Harris and Mitchell instructed Mrs. Moore to return to her apartment and stay there.

Mitchell returned to the third floor and told Parker that they were unable to reach Harris. Parker replied: "Well, Eddie Harris probably don't know anything about it anyway * * * These two know about our [belongings] * * * and they's coming up with it." He threatened to kill Moore and Carter by putting golf balls in their mouths.

Carter opened one of the windows, but Parker slugged him on the back of the head with a bat knocking him back down on the couch. He then began beating Moore about the head. Moore pleaded, "Please don't hit me, Parker don't kill me." While Parker was turned on Moore, Carter got to a window and jumped out. Despite his injuries, he was able to get up and run. He continued to run, looking for policemen, until he came to an open restaurant where the manager wiped the blood from him and called the police. He was bleeding profusely when the police arrived and two men were holding him up. He was taken to a hospital where he was found to be bleeding from lacerations on the head, face and scalp. He had abrasions and contusions on his shoulders, arms and leg. He had a cerebral concussion, and x-rays revealed a fracture of the left shoulder blade.

After talking to Carter, the police converged on Parker's apartment. It was 5:15 a.m. when they entered the building with their guns drawn. Mitchell opened the door. Moore was slumped on a couch, bleeding profusely about his head, his clothes were disheveled and his shirt was covered with blood. Parker was drinking beer out of a water pitcher. Knives, forks, dishes and other kitchen utensils were spread all over. A blood-covered baseball bat was in the center of the room and a broken bat, with blood on it, was under the couch. Moore said "he wanted out of there, he got tricked." Parker told the police that he was glad they had

come, that he was just going to call them. He said he had caught two men burglarizing his apartment but one of them got away.

Parker, Mitchell and Malveaux were arrested and Moore was taken to a hospital. He had no fracture of the skull or extremities, but he was suffering from lacerations on his skull and from lacerations and abrasions on his arms and legs. His condition deteriorated rapidly. A neurological examination revealed that his left pupil was larger than his right and he did not respond to verbal or painful stimuli. His symptoms indicated rapidly increasing intercranial pressure. Surgery was performed and a large blood clot was removed from beneath the dura membrane of his brain. The underlying brain structures were found to be bruised and bleeding. Moore remained unconscious for three weeks and then died. During the three-week period he developed a number of associated medical problems: infection, gastrointestinal bleeding, diabetes and pneumonia.

A pathologist, who performed an autopsy on Moore, testified that his death was related to a cranial-cerebral injury with a cerebral concussion and subdural hematoma. He believed that the hematoma was caused by the force of a blunt object.

At his trial, Parker admitted that he struck Moore and Carter, but said that he did this only a short time before the police arrived and then did so in self-defense. He related an entirely different version of the night's events. He said that between 4 and 6 p.m. he went to a park with Malveaux and Mitchell; Mrs. Moore and the Moore children joined them later. Before he left he saw Carter in a window of the Moore apartment and he was told that Howard Moore would not be able to go because he was not feeling well.

He said that when he returned to his apartment he saw Moore coming out of the kitchen carrying bags of groceries and Carter emerging from a bedroom with a bag of clothes. He also saw that his television set was missing. When he asked what they were doing in his home, they replied that they heard a commotion on the third floor and came up to investigate. He told them to sit down and remain until everyone came back from the park. He placed a golf bag that contained golf clubs and two baseball bats, one of which had broken in the park, next to him. He said he did not take the bats from the bag, strike or threaten either man.

When the others returned he told them what had taken place. The building manager was sent for to see if he could verify Moore's story. Otto said he saw Moore and Eddie Harris carrying the television set and other things out of the building. Moore then admitted committing the burglary and said that Carter acted as a lookout. Moore gave his wife Harris' phone number and instructed her to call him in an effort to get him

to return the property. Mitchell accompanied her. They returned in 15 minutes and said they could not get an answer. A second attempt was also unsuccessful. Mrs. Moore then took her children downstairs. Parker asserted that he did not call the police because it appeared that Moore was trying to get his belongings back.

A half hour later, Parker instructed Mitchell to have Mrs. Moore call Harris a third time and instructed Malveaux to search the empty apartments in the building. Parker testified that while he was alone with Moore and Carter, they suddenly arose from the couch and one of them seized an African spear from the wall and the other a lamp. In self-defense he grabbed one of the bats and hit Carter a couple of times "alongside the head," and swung at Moore, who was jabbing him with the spear. When the cracked bat broke he grabbed the second one. Carter, who was bleeding from the first series of blows, attempted to strike Parker with an end table. Parker retaliated by hitting him several times on the arm. Moore came at him with a pocket knife and Parker struck him a few times with the bat. Carter jumped out the window. Parker knocked the knife from Moore's hand and Moore gave up the fight. Parker said the entire fight lasted five or six minutes. Twenty minutes after it was over Mitchell and Malveaux came back and ten minutes later the police arrived.

In support of his contention that the State did not prove him guilty beyond a reasonable doubt, Parker argues that the testimony of Mrs. Moore and Carter is unbelievable. He points out that he and the Moores were friends and the only logical explanation for his actions is that he caught Moore and Carter in the act of burglarizing his apartment; that Mrs. Moore never called the police or sought assistance although she had opportunities to do so, and that the absence of skull fractures and broken bones renders Carter's account of long and forceful beatings implausible.

Although the suspicion of burglary may explain Parker's actions, it does not justify them. He had no right to take the law into his own hands and hold Moore under duress in his apartment for eight hours and Carter for four, and to beat them while they were being held.

Mrs. Moore's failure to seek aid is hard to justify. Once or twice during the night she was alone in her apartment. She had seen what was happening to her husband and brother, and it would seem normal, if she had thought they were being injured, for her to have gone for help. But it was between midnight and dawn when she was away from the men, her apartment had no telephone and the one in the building was not working. She would have had to leave the building to make a telephone call and she had two small children to think about. She had been threatened by Mitchell and she had reason to be afraid of him and to be concerned for the safety of her children.

The fact that Moore and Carter had no fractures does not cast doubt on Carter's testimony that he and Moore were intermittently beaten with baseball bats. Parker asserts that it is inconceivable that a person of his size, swinging a bat with the full force over a period of three or four hours at relatively stationary targets, would not·have broken their skulls or bones. He concludes that this proves that their injuries occurred in the brief fight that ensued after they attacked him. The medical testimony and the fact that Carter leaped out of a third-story window to escape Parker's blows refute this argument. Only a real fear for one's life could motivate a person to risk the serious injuries that could result from such a fall. The testimony of the doctor who attended Carter was that most of his injuries—cerebral concussion, multiple abrasions and lacerations on his body, face and scalp—were consistent with the type an individual would suffer if beaten with a baseball bat. Carter was placed in intensive care and kept in the hospital for a week. Moore lost consciousness soon after he entered the hospital. He had contusions, abrasions and lacerations over much of his body and his upper and lower extremities were swollen. He underwent emergency surgery because of intercranial pressure caused by the blows to his head which he had received in spite of his efforts to deflect them by throwing up his hands. In the opinion of the neurosurgeon who operated on him, Moore died because of his head injury and supervening medical complications. The pathologist who examined him after death testified that the absence of a skull fracture had no significance in relation to the cause of his death or to the damage inside his head—that there could be severe internal brain damage from external trauma without skull fracture. The evidence shows that Moore and Carter were severely injured and that they were subjected to long beatings; it does not support Parker's claim that both men were only superficially injured in a brief encounter with him. The evidence established his guilt beyond all reasonable doubt.

■■ ■ Parker tendered, but the court refused, an instruction that would have informed the jury that voluntary manslaughter could be the killing of an individual while acting under sudden and intense passion, resulting from serious provocation by the person killed. Parker's defense was that he struck Moore and Carter in self-defense when they attacked him. A defense of deliberate self-defense negatives an inference of sudden and intense passion. (*People v. Clark* (1973), 15 Ill. App. 3d 756, 305 N.E.2d 218.) The court instructed the jury at the defendant's request that the crime of murder included the crime of voluntary manslaughter; that voluntary manslaughter was an unreasonable belief that circumstances existed which justified the killing of the deceased; about the elements that must be proven to establish voluntary manslaughter and about the use of force in self-defense. The jury was correctly instructed

and the tendered instruction on the second phase of voluntary manslaughter was properly rejected.

■■ In rebuttal to Parker's testimony that he had seen Carter looking out of a window of the Moore home in the late afternoon and had caught him in the early evening carrying a bag of clothes from a bedroom in his apartment, the State called the bookkeeper of the company where Carter worked. The company hired laborers by the day and paid them on the day they worked. Carter was one of these and he received one day's pay for one day's work. The bookkeeper testified that although she could not identify Carter, her records showed that a John Carter worked for her company from 3 p.m. to 11:30 p.m. on August 10, 1973. She said he had been referred to them by an organization called Labor-Men. Parker was called in surrebuttal. He said he had worked for Labor-Men and that he was familiar with that agency's practice in assigning men to jobs. An objection to this testimony was sustained and Parker's counsel made an offer of proof that, if allowed, Parker would testify that men who were given slips to report to work at designated places often gave these slips to others who would report in their stead. It is now contended that the rejection of this testimony was error. An analagous contention is that a prejudicial statement was made by the prosecutor in his final argument when he said that the bookkeeper's testimony was uncontradicted that Carter was at work on the night of August 10. The proffered testimony was speculative and of no value in proving that Carter did not work the hours he and the bookkeeper said he did. The prosecutor's remark was somewhat inaccurate—inasmuch as Parker had contradicted the import of the bookkeeper's testimony—but not prejudicial.

Other comments made by the prosecutor are said to have denied the defendant a fair trial. One occurred during the selection of the jury when the prosecutor referred to him as a "mope" and the other in closing argument when he referred to him as the "Jolly Green Giant." The first comment was not made to the jurors but to a bailiff; when the defendant's attorney informed the judge about it and asked for a mistrial, the prosecutor explained that it was made when he was 60 feet from the jury. The attorney felt some jurors might have heard it, but the court felt otherwise. An objection to the second comment was sustained and the jury was instructed to disregard it. Under these circumstances neither comment deprived the defendant of a fair trial.

■■ Exception is also taken to other remarks made by the prosecutor in final argument. We have considered all of these, but believe only one merits discussion. In speaking about the State's witnesses, the prosecutor said: "Well, if it didn't happen the way John Carter and Magdelene Moore said it did, why didn't they bring in Otto [the building manager] to say, no way?" The failure to call a witness may not be relied upon as substantial

proof of a criminal charge. If, however, other evidence tends to prove the defendant's guilt and he fails to bring in evidence within his control in explanation or refutation, his omission to do so is a circumstance entitled to some weight in the minds of the jury and, as such, is a legitimate subject of comment by the State's attorney. (*People v. Poole* (1970), 121 Ill. App. 2d 233, 257 N.E.2d 583.) Parker had testified that the building manager said he saw Moore carrying the stolen articles out of the building. If he actually said this, he presumably would have been a favorable witness for Parker. Moreover, Parker's attorney had implied in his argument that the manager's testimony would corroborate Parker's version of what took place. The prosecutor was replying to this implication. A defense attorney cannot provoke a reply to his own improper argument and then claim error. (*People v. Weisberg* (1947), 396 Ill. 412, 71 N.E.2d 671.) The court did not err in overruling the objection to the prosecutor's remark.

At one point in the trial, the defendant's attorney sat on the counsel table. The trial court reprimanded him saying:

> "Counsel will you do me a favor, get off the table, first of all, you are not in a saloon. Sit in a chair. Ask the questions.
>
> Attorney: I'm sorry, I can't see him.
>
> The Court: Move the chair over to the other side. We don't sit on tables. Proceed."

A motion was made for a mistrial. The court denied the motion, but later instructed the jury to disregard the admonishment. It is claimed that the reprimand, in front of the jury, prevented the defendant from receiving a fair trial. Every defendant, regardless of the nature of the proof against him, is entitled to a trial that is free from improper comments that engender prejudice. (*People v. Stock* (1974), 56 Ill. 2d 461, 309 N.E.2d 19.) However, where it appears that the comments do not constitute a material factor in the conviction, or that prejudice to the defendant is not their probable result, the verdict will not be disturbed. (*People v. Lewis* (1976), 38 Ill. App. 3d 995, 349 N.E.2d 528.) The words "* * * you are not in a saloon" were, unfortunately, unnecessarily harsh. However, the judge told the jury to pay no attention to his criticism and this cured any possible prejudicial effect his words may have had.

■■ During its deliberations, the jury asked for clarification of the instructions on murder and voluntary manslaughter. The court reread the instructions on these subjects. In a subsequent colloquy it developed that the jury's basic difficulty was with the portion of the manslaughter instruction pertaining to a defendant's belief that circumstances existed which justified the killing but that his belief was unreasonable. The court explained that it went to his state of mind and pointed out the difference between murder and voluntary manslaughter. The foreman of the jury mentioned that the term "great bodily harm" was used in the charge of

murder but was not used in the charge of voluntary manslaughter. He said that it seemed to some people on the jury that possibly this term should also be in the voluntary manslaughter instruction. The court replied:

"This is the definition under the statute which we must give and that is what the statute reads. What you are talking about is rewriting the Illinois statute, which you cannot do. This is the way the statute is drafted and that is what we have to give, and based upon that you have to render a decision on those two."

Parker asserts that the way the court handled the jury's inquiries requires the reversal of his conviction. He complains that the court gave the jury the impression that in order to find him guilty of voluntary manslaughter it had to find that he intended to kill Moore, and since there was no evidence that this was his intention, the jury had no choice but to find him guilty of murder or acquit him. We believe this conclusion is farfetched. The rereading of the instructions and the court's explanations should have eliminated any confusion the jury had concerning the differences between murder and voluntary manslaughter. Because of the court's action it is highly improbable that the jurors completely disregarded the manslaughter instructions in thier resumed deliberations. When a jury raises an explicit question on a point of law arising from the facts over which there is doubt, the trial court should attempt to clarify the question in the jury's mind. (*People v. Kucala* (1972), 7 Ill. App. 3d 1029, 288 N.E.2d 622.) In suggesting that the element of "great bodily harm" should be added to the definition of voluntary manslaughter, the jury was stepping outside its province, and the court quite properly terminated the discussion. The defendant was not hurt by the exchange between the court and the jury, and a judgment will not be reversed when it is apparent that no injury has resulted from such an exchange. *People v. Tilley* (1952), 411 Ill. 473, 104 N.E.2d 499.

■■ The defendant contends that his sentence is excessive and was imposed in part because he would not admit his guilt and in part because of the sentences that Mitchell and Malveaux had received. At the hearing in mitigation and aggravation, Parker kept insisting that he should not have been charged with murder because a doctor had testified that Moore died of pneumonia and diabetes. The court chided him for his lack of remorse, characterized his crime as a brutal one—the most serious he had seen—found that there was little chance of his rehabilitation and said: "I don't know how a man can sit there and beat another man with a baseball bat the way he did and not only that, two other fellows are going to the penitentiary for 14 years due to his act." (Mitchell and Malveaux were tried by a jury, found guilty and sentenced from 14 to 30 years for murder.)

We find no validity in the defendant's contention that he was punished

for refusing to admit his guilt. Unlike the case of *Thomas v. United States* (5th Cir. 1966), 368 F.2d 941, cited by the defendant, where the trial court told the accused that if he would "come clean," it would take that into account in determining the length of his sentence, the trial court here neither asked Parker to admit his guilt nor offered him a lesser sentence if he did. Similarly, we find no merit in the defendant's contention that the court erroneously considered the sentences imposed on Mitchell and Malveaux. Section 5—4—1(b) of the Unified Code of Corrections provides:

> "Where the judge does not impose sentence at the same time on all defendants who are convicted as a result of being involved in the same offense, the defendant or the state's attorney may advise the sentencing court of the disposition of any other defendants who have been sentenced." Ill. Rev. Stat. 1973, ch. 38, par. 1005—4—1(b).

In imposing a sentence of 40 to 100 years, the trial court assessed Parker's chances for rehabilitation—he had been twice convicted of the offense of unlawful use of weapons—and considered the brutality of his crime. The sentence was not inappropriate.

Judgment affirmed.

MEJDA, P. J., and McGLOON, J., concur.